# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 17, 2001 Session

## STATE OF TENNESSEE v. OSCAR GOMEZ

### Appeal from the Criminal Court for Davidson County
### No. 99-C-1975     Walter Kurtz, Judge

---

### No. M2001-00130-CCA-R3-CD - Filed November 16, 2001

---

The Defendant, Oscar Gomez, was convicted by a jury of first degree premeditated murder and theft under five hundred dollars.  He was sentenced to life imprisonment for the murder and to a concurrent term of six months for the theft.  In this appeal as of right, the Defendant contends that the evidence of premeditated murder is insufficient to support his conviction.  We disagree and affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

John E. Rodgers, Jr., Nashville, Tennessee, for the appellant, Oscar Gomez.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Sharon Brox, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

During the early morning hours of March 21, 1999, Amber Bruchett Majano, Larry Melton, Patricia Melton, Monique Ells, Ronald Fuentes, Caesar Corrales, the Defendant and others were gathered at San Jose's, a restaurant and bar on Nolensville Road in Nashville.  They had all been drinking to some extent. Larry and Patricia Melton left the bar and drove home; the others left some time later in three separate vehicles.

Amber Majano testified that she was in a car with several other people, following a truck in which the Defendant was riding.  Another car containing members of the group followed the vehicle in which Majano was riding.  All three vehicles were proceeding on Nolensville Road toward downtown Nashville.  Majano stated that they passed two Hispanic males walking on the sidewalk. She heard Fuentes and the Defendant yell something about Hispanic gangs at the two men.  She saw

the two men take off running, and the truck in which the Defendant was riding then made a u-turn; the car in which Majano was riding, along with the car behind her, followed. The vehicles pulled into a side road, near a lot in which a number of cars were parked. Majano stayed in the car in which she was riding; she saw the Defendant, Fuentes and some of the other men who had been with them at San Jose's running through the parked cars. She testified that she saw "blocks" flying.[1]  As Majano continued to watch, she saw the victim "go down." She also saw the Defendant strike the victim and make stomping and kicking motions with his legs. Majano testified that she saw the Defendant holding a concrete block while raising it up and down in his hands. She did not see what, if anything, the block was striking, but saw the Defendant raising and lowering the block two or three times. She explained that, because of the cars blocking her vision, she could not see what was occurring below the Defendant's waist. She did not see anyone else strike the victim with a concrete block.

When everybody came running back to the vehicles, Majano heard the Defendant state, "I think he's dead; I think we killed him." The three vehicles then drove to the Meltons' house. Once they arrived, Majano testified, the Defendant and a few of the others "were just kind of standing up making it to be like it was a big deal, [that] it was something good that they had done." She stated that the Defendant was bragging about how they had killed someone. She also testified that the Defendant had blood on his shoes and that he put them in the bathtub and told her to wash them off. She refused to do so.

The next morning Majano asked the Defendant if they had really killed someone. She testified that he responded, "yeah, we killed him; there lays his tennis shoes over there." She explained that the Defendant told her that he had returned to the scene to make sure the victim was dead, and took the victim's shoes. Majano testified that the Defendant later sold the victim's shoes for thirty dollars. The Defendant subsequently told her, "what happens in a gang stays in the gang," which Majano understood to be a threat. She explained that the Defendant was a member of the MS13 gang. Caesar Corrales testified that MS13 is a gang from El Salvador.

Larry Melton testified that, after the Defendant came to his home that night, the Defendant told him that they had gotten into a fight on Nolensville Road, kicked a "guy," and "hit him with a brick-o-block." Melton testified that the Defendant demonstrated how he had hit the victim, and stated that he thought they had killed the victim. The Defendant explained to Melton that the fight started when someone on Nolensville Road hollered at them, and then threw a rock at their car when the Defendant hollered back.

Monique Ells testified that she was driving the vehicle in which the Defendant was riding. She stated that they passed "a couple of Mexicans" and the Defendant yelled "MS13" to them in Spanish. She explained that MS13 was the gang to which the Defendant belonged. The Defendant told her to turn the car around, and she then pulled into a lot where other vehicles were parked. The

_____

[1]The witness referred to the blocks as "cinder blocks" or "brick-o-blocks."

two men they were following jumped up from behind two of the parked cars and started throwing rocks at them. The Defendant got out of the car and, together with Corrales and Fuentes, chased the two men. After five to ten minutes, Ells testified, she saw the Defendant with a block in his hand, moving his hands "like this." After the Defendant returned to the car, he told her that he thought he had killed someone. After they arrived at the Meltons' house, she saw the Defendant's shoes in the bathroom and saw blood on the bottoms of the shoes. When she spoke with the Defendant some days later about the killing, she testified, the Defendant told her, "if anybody said anything, he'd put them in the ground before he'd go to jail."

The victim was sixteen-year-old Alejandro Diaz. Diaz was found at the scene of the killing lying face down with half of a concrete block lying on the back of his head. The victim's body was found lying in a corner formed by the wall of a building and a chain link fence. His shoes were gone, but his socks were clean. His shirt bore markings as though he had been kicked. Law enforcement's efforts notwithstanding, no fingerprints were recovered from the scene. Dr. Bruce Phillip Levy, the medical examiner who performed the autopsy on the victim, testified that Diaz died "as a result of blunt force injuries to his head." Levy stated that the victim suffered multiple skull fractures, and that the injuries were consistent with being struck with a concrete block. He further testified that "a considerable amount of force was used" to inflict the injuries, and that the victim had been struck around the head a minimum of five times. The victim also suffered injuries to his hands and arms that were consistent with defensive wounds.

The only issue raised by the Defendant in this appeal[2] is the sufficiency of the evidence establishing that he killed the victim with premeditation. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-

---

[2]In his brief the Defendant also raises an issue concerning the trial court's charge to the jury on lesser-included offenses. However, the Defendant conceded that this issue was without merit during the oral argument of this case. Moreover, the Defendant has failed to provide this Court with either a transcript or copy of the trial court's jury instructions as required by Tennessee Rule of Appellate Procedure 24(b). Accordingly, this issue is also waived. See State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

weigh or re-evaluate the evidence" in the record below. <u>Evans</u>, 838 S.W.2d at 191; <u>see also</u> <u>Buggs</u>, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. <u>Tuggle</u>, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. <u>See</u> <u>State v. Morris</u>, 24 S.W.3d 788, 795 (Tenn. 2000); <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

A premeditated killing is one done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation requires that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." <u>Id.</u> In order to support a finding of premeditation, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." <u>Id.</u>

The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. <u>See</u> <u>State v. Suttles</u>, 30 S.W.3d 252, 261 (Tenn. 2000). Factors tending to support the existence of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, and calmness immediately after the killing. <u>See id.</u> (citing <u>State v. Bland</u>, 958 S.W.2d 651, 660 (Tenn. 1997)). While the infliction of multiple blows to the victim is not alone sufficient to establish premeditation, <u>see</u> <u>State v. Brown</u>, 836 S.W.2d 530, 541-43 (Tenn. 1992), repeated blows that evidence the particularly brutal nature of the killing are supportive of a jury's finding of premeditation. <u>See</u> <u>State v. Sims</u>, 45 S.W.3d 1, 8 (Tenn. 2001).

We conclude that the circumstances surrounding the killing of Diaz support the jury's finding that the Defendant killed the victim with premeditation. The attack was precipitated by the Defendant after the Defendant yelled his gang's name at the victim and the victim or another man responded by throwing a rock at the Defendant's car. Although the victim ran from the Defendant and the Defendant's companions, he was unable to escape. According to the proof, the only "weapons" seen used by the victim were rocks and other thrown material; that he was unarmed may also be inferred from the defensive wounds he suffered to his hands and arms. The proof established that the Defendant hit and kicked the victim and then repeatedly struck the victim in the back of the head with a concrete block after the victim had fallen down. The victim was found face down with one-half of a concrete block lying on the back of his head. The victim was killed by at least five blows from a blunt object to the back of his head: that is, the victim was literally beaten to death with a piece of cement block as he lay face down in the dirt and trapped in a corner. Certainly the Defendant had the opportunity while he chased the victim, kicked him, and then between each blow to the victim's head to consider his actions and to decide whether to continue his attack or to stop. After he killed the victim, the Defendant returned to the house where he was living and boasted to others about the killing. He then returned to the scene of the crime to make sure that the victim was

dead and to steal the victim's shoes.  These circumstances support the jury's finding that the Defendant killed the victim with premeditation, and this issue is therefore without merit.

The judgment of the trial court is accordingly affirmed.

                    _____

                    DAVID H. WELLES, JUDGE